```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
ROSANNA BATISTA,                                  :
o/b/o, M.B.                                       :
                        Plaintiff,                :
                                                  :          **MEMORANDUM AND ORDER**
            -against-                             :          08-CV-2136
                                                  :
                                                  :
MICHAEL J. ASTRUE,                                :
Commissioner of Social Security,                  :
                                                  :
                        Defendant.                :
-----------------------------------------------------------------x
```
**DORA L. IRIZARRY, United States District Judge:**

Plaintiff Rosanna Batista filed an application for supplemental security income ("SSI") under the Social Security Act (the "Act"), on behalf of her minor daughter, M.B., on August 11, 2004. (R. 62-64.)[1] The Social Security Administration denied plaintiff's application on October 18, 2004, and plaintiff requested a hearing before an administrative law judge ("ALJ"). (R. 26, 30.) After holding a hearing on June 26, 2006, at which plaintiff and M.B. were represented by counsel (R. 443-63), ALJ Leonard E. Ryan issued an opinion on January 26, 2007 concluding that M.B. was not disabled within the meaning of the Act. (R. 14-24.) On April 17, 2008, the ALJ's decision became the Commissioner's final decision when the Appeals Council denied plaintiff's request for review. (R. 4-6.) Plaintiff filed the instant action seeking judicial review of the denial of benefits. The Commissioner moves for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c), seeking affirmation of the denial of benefits. Plaintiff cross-moves for judgment on the pleadings, seeking remand of M.B.'s case to the Commissioner for further administrative proceedings. For the reasons set forth below, the Commissioner's motion is granted and plaintiff's cross-motion for judgment on the pleadings is denied.

---

[1] "R." refers to pages from the administrative transcript.

## BACKGROUND

**A.      Non-medical Evidence**

     **1.      Questionnaires and Written Reports**

On August 11, 2004, plaintiff filed an application on behalf of her daughter, M.B., who was born on December 13, 1993 in the United States. (R. 62.) As part of her application, plaintiff completed a function report and indicated that M.B. walked with a limp, had only limited ability to engage in any activities involving the use of her legs, and had several inner ear operations. (R. 77, 73.) Plaintiff also completed a disability report on August 13, 2004, and noted that M.B. had a heart problem, rheumatic fever, leg pain, a left ear problem, and difficulty walking. (R. 98.) The report also indicated that M.B. had undergone speech and language testing on May 6, 2002, but she was not in special education classes or receiving speech therapy at that time. (R. 102.)

     **2.      School Evidence**

On May 6, 2002, M.B. underwent a review by the Committee on Special Education at her school. (R. 129-32.) The Committee issued a report which classified M.B. as non-handicapped, and surmised that M.B. was Spanish-dominant and had borderline cognitive functioning and low-average academic performance in all areas assessed. (R. 131.) Nevertheless, the report concluded that M.B.'s behavior was age appropriate, and no behavior intervention plan was required. (R. 132.) M.B.'s third grade report card states that M.B. "struggles academically," but "demonstrates a strong yearning to improve." (R. 109.) M.B.'s third grade teacher reported in a questionnaire that M.B. had difficulty comprehending information and participating in class. (R. 86.)

B.   **Medical and Psychiatric Evidence**

1.   **Plaintiff's Medical and Psychiatric Evidence**

On April 2, 2001, M.B. underwent audiological testing at the New York Eye and Ear Infirmary, the results of which indicated that she had slight to mild conductive hearing loss and "very good speech recognition." (R. 135-36.) The audiologist recommended that M.B. receive preferential classroom seating. (R. 136.)

On March 27, 2004, M.B. went to the Brownsville Multiservice Family Health Center ("BMC") complaining of chest pain on her left side, although the results of this visit are unclear from the record. (R. 146, 223.) On May 14, 2004, M.B. went to BMC again, this time complaining of pain in her right leg, shoulder, and arm (R. 144, 200), and returned there three days later because of difficulties turning her head (R. 143). During her visit, M.B.'s ESR (erythrocyte sediment rate)[2] level was twice the normal amount. (R. 155.) On May 17, 2004, Brookdale Hospital admitted M.B., and an echocardiograph (sonogram of the heart) revealed that she had rheumatic fever with moderate mitral regurgitation[3] and an ECG (electrocardiography) revealed that she had a heart arrhythmia. (R. 396, 422.) The hospital discharged M.B. on May 19, 2004 after a course of antibiotics and advised her to follow up with a cardiologist and receive monthly penicillin shots to prevent infection. (R. 372.)

---

[2] Erthrocytes are mature red blood cells, and ESR measures the rate at which red blood cells precipitate from the blood in a period of one hour; the ESR test is used to measure inflammation. Schmidt, J.E., ATTORNEY'S DICTIONARY OF MEDICINE AND WORD FINDER. Vol. 2, E-188, S-86 (Matthew Bender 2009) .

[3] Mitral regurgitation is the backward flow of blood through an incompetent mitral valve of the heart. STEDMAN'S MEDICAL DICTIONARY 1121, 1547 (27th ed. 2000) ("*Steadman's*").

On August 13, 2004, M.B. visited her cardiologist, who diagnosed her with a 2/6 systolic murmur[4] and above-normal sediment rates. (R. 366.) On August 23, 2004, she again visited her cardiologist, who diagnosed M.B. with thickened redundant mitral valve leaflets[5] with mitral regurgitation. (R. 364.) On September 10, 2004, M.B.'s cardiologist found that her symptoms had resolved. (R. 365.) On November 12, 2004, however, her cardiologist found that M.B. had a 2/6 systolic murmur and mild mitral regurgitation. (R. 360.) M.B. did not receive additional treatment for these irregularities. Instead, M.B.'s cardiologist instructed her to continue monthly penicillin shots. (R. 360.)

An outer ear clinical exam on March 7, 2005 showed that M.B.'s hearing was within normal limits bilaterally, (R. 237), but on April 30, 2005, at the Kings County Hospital Center, M.B. reported decreased hearing and bleeding in her right ear, (R. 242). An audiological exam on September 20, 2005 revealed that she had mild to moderate loss in both ears. (R. 272.) On March 15, 2006, an audiologist diagnosed M.B. with mild to moderate hearing loss. (R. 282.)

As early as November 11, 1999, when M.B. was nine years old, she visited psychiatrist Dr. Fermi Gonzalez, because she had separation anxiety when dropped off at school and in other situations. Dr. Gonzalez prescribed Benadryl to alleviate her symptoms. (R. 338.) On June 23, 2005, M.B. again visited Dr. Gonzalez regarding anxiety. Dr. Gonzalez diagnosed M.B. with Generalized Anxiety Disorder and Major Depression, (R. 340, 342), and prescribed Prozac and Benadryl for her insomnia, (R. 340). In July, August, September, and December of 2005, Dr. Gonzalez reported that M.B.'s condition was stable with medication. (R. 339-44.)

---

[4] A systolic murmur is a murmur heard during a ventricular contraction (systole). *Stedman's*, at 1141.

[5] Leaflets are a layer of phospholipids, which are the basic constituents of bio-membranes (cell walls). *See Stedman's*, at 979, 1374.

## 2. Consulting Physician Reports

On September 22, 2004, psychiatrist Dr. Herbert Meadow evaluated M.B. (R. 161-62.) Dr. Meadow noted that M.B. had a mild to moderate speech impediment and was "beneath age appropriate to do age appropriate tasks and learn age appropriate materials in school." (R. 161-62.) He therefore diagnosed her with learning disabilities. (R. 162)

On September 22, 2004, M.B. visited consultative pediatrician Dr. Tomasito Virey. (R. 163.) Dr. Virey heard a mild hum on the left sternal border and a 1/6 systolic murmur on the left sternal border. (R. 164.) In addition, Dr. Virey noted that M.B. had normal musculoskeletal development, adequate muscle strength, and full range of motion in her extremities, as well as a normal pulse and spine. (R. 164.) He concluded that her ability to engage in age-related activities was only mildly to moderately affected. (R. 165.)

On October 5, 2004, Dr. V.B. Gupta reviewed the medical evidence submitted by plaintiff, and noted that M.B. had rheumatic fever and a learning disability, which were severe impairments, but opined that her impairments or combination of impairments did not meet, medically equal, or functionally equal the Listings of Impairments in 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("the Listings"). (R. 166.) On October 7, 2004, Dr. J. Kessel also reviewed the medical record, and concurred with Dr. Gupta's opinion. (R. 167.)

## C. Hearing Testimony

On June 26, 2006, ALJ Leonard E. Ryan conducted a hearing. (R. 445-63.) Plaintiff testified that M.B. could not endure long periods of play, and tired very easily due to the infection in her heart, for which she receives monthly penicillin shots. (R. 449.) However, plaintiff also testified that M.B.'s heart was "back to regular." (R. 449.) Plaintiff further explained that M.B.

has a history of recurrent ear infections, and has had three operations. (R. 450.) Plaintiff stated that M.B. has to sit at the front of the classroom in school because she has difficulty hearing, (R. 450), but M.B.'s hearing had improved since her most recent operation (R. 453).

Plaintiff reported that M.B. had been seeing a psychiatrist for a year because she was suffering from "bad nerves," depression and insomnia. (R. 451.) Plaintiff stated that the psychiatrist had prescribed Prozac and Benadryl for M.B., and she had improved slightly with treatment. (R. 455.) Plaintiff also testified that M.B. did not pay attention or complete chores because she became easily distracted. (R. 453.)

M.B. testified that her hearing was doing well, and she had another operation scheduled for her ear, although she did not wear a hearing aid. (R. 462.)

**D.    New Evidence**

   **1.    Evidence Submitted to the Appeals Council**

Plaintiff submitted additional evidence to the Appeals Council. First, plaintiff submitted a notice from the New York City Department of Education, dated March 2, 2007, informing plaintiff that M.B. had been classified as having a learning disability, and recommending Special Education Teacher Support Services ("SETSS"). (R. 437, 442.) Second, plaintiff submitted a note written by Dr. Tashi Cohen to the file, dated March 19, 2007, stating that M.B. had hearing loss in both ears, required several surgeries and might require additional intervention in the future. (R. 436, 441.) Dr. Cohen recommended that the school place M.B. in special education classes or provide beneficial seating. (R. 436, 441.)

### 2. Documents Submitted in Conjunction with this Action

Plaintiff also submitted two documents in conjunction with this appeal. (*See* Plaintiff's Notice of Cross-Motion for Judgment on the Pleadings, "Doc. 19".) First, plaintiff submitted a Psychoeducational Report dated December 05, 2006, in which school psychologist Dr. Ira Rubenstein reported that the school referred M.B. for evaluation because she was struggling academically and had a number of health problems that impacted her academic and social-emotional development. (Doc. 19 at 1.) Dr. Rubenstein evaluated several aspects of M.B.'s functioning and skills. He concluded that M.B. had an IQ of 83, which is below average, but had inconsistent scores in other areas. (*Id*. at 3-4.)

Second, plaintiff also submitted a speech and language evaluation, dated January 04, 2008, conducted by speech/language pathologist Claire Gordon. (Doc. 19, Ex. A, at 1.) Ms. Gordon concluded that although M.B.'s language skills were adequate to communicate everyday needs, tests indicated "profound receptive, severe expressive, and moderate phonological, language delays," commensurate with her overall level of academic functioning. (*Id.* at 2.)

## APPLICABLE LAW

### A. Standard of Review

This Court has the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). In reviewing the Commissioner's decision, the Court need not determine de novo whether a claimant is disabled. *See Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996). Rather, the Court's inquiry is limited to the question of whether the Commissioner applied the correct legal standard in making the

determination and, if so, whether such determination is supported by substantial evidence in the record. *See* 42 U.S.C. § 405(g); *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000); *Beauvoir v. Chater*, 104 F.3d 1432, 1433 (2d Cir. 1997). "'Substantial evidence' is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Lamay v. Astrue*, 562 F.3d 503, 507 (2d Cir. 2009) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

"[T]o determine whether the findings are supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999) (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983)). Moreover, "[e]ven when a claimant is represented by counsel, it is the well-established rule in our circuit 'that the social security ALJ, unlike a judge in a trial, must on behalf of all claimants . . . affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding.'" *Moran v. Astrue*, 569 F.3d 108, 112-13 (2d Cir. 2009) (quoting *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 508-09 (2d Cir. 2009)). Therefore, the court must be satisfied "that the claimant has had a full hearing under the . . . regulations and in accordance with the beneficent purposes of the [Social Security] Act.'" *Id.* at 112 (quoting *Cruz v. Sullivan*, 912 F.2d 8 (2d Cir. 1990)).

"If the reviewing court finds substantial evidence to support the Commissioner's final decision, that decision must be upheld, even where substantial evidence supporting the claimant's position also exists." *Hernandez v. Barnhart*, 2007 WL 2710388, at *7 (S.D.N.Y. Sept. 18, 2007) (citing 42 U.S.C. § 405(g)). "The role of the reviewing court is therefore 'quite limited and

substantial deference is to be afforded the Commissioner's decision.'" *Id.* (quoting *Burris v. Chater*, 1996 WL 148345, at *3 (S.D.N.Y. Apr. 2, 1996)).

**B.      Governing SSA Regulations for Defining Childhood Disability**

To qualify for SSI benefits, a child under the age of eighteen must have "a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i); *see also Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004). The SSA has provided a three-step sequential analysis to determine whether a child is eligible for SSI benefits on the basis of disability. 20 C.F.R. § 416.924(a); *see also Pollard*, 377 F.3d at 189.

First, the ALJ must consider whether the child is engaged in "substantial gainful activity." 20 C.F.R. § 416.924(b). "Second, the ALJ considers whether the child has a 'medically determinable impairment that is severe,' which is defined as an impairment that causes 'more than minimal functional limitations.'" *Pollard*, 377 F.3d at 189 (quoting 20 C.F.R. § 416.924(c)). Third, " if the ALJ finds a severe impairment, he or she must then consider whether the impairment 'medically equals' or . . . 'functionally equals' a disability listed in the regulatory 'Listing of Impairments.'" *Id.* (quoting 20 C.F.R. § 416.924(c), (d)). Under the third step, to demonstrate functional equivalence to a Listing impairment, the child must exhibit "marked" limitations in two of six domains, or an "extreme" limitation in one domain. 20 C.F.R. § 416.926a(a). These six domains consider a child's: (1) ability to acquire and use information; (2) ability to attend and complete tasks; (3) ability to interact and relate with others; (4) ability to move about and manipulate objects; (5) ability to care for oneself; and (6) health and physical

well-being. 20 C.F.R. §§ 416.926a(a)-(b). A "marked" limitation "interferes seriously with [the child's] ability to independently initiate, sustain, or complete activities." *Johnson*, 563 F. Supp. 2d at 454 (quoting 20 C.F.R. § 416.926a(e)(2)(i)). In addition, the regulations provide that a limitation is "marked" when standardized testing shows functioning two standard deviations below mean levels. *Id.*; *see also Pacheco v. Barnhart,* 2004 WL 1345030, at *4 (E.D.N.Y. June 14, 2004). An "extreme" limitation exists when the impairment "interferes very seriously with [the child's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(i). An "extreme" limitation would be found in a domain where the child scores at least three standard deviations below average. *Id.*

## DISCUSSION

### A.  ALJ's Opinion

The ALJ found that the first and second requirements of demonstrating childhood disability were met because: (1) M.B. had never been employed, and (2) her rheumatic fever and hearing loss secondary to ear infections, tube placement and surgeries were severe impairments within the meaning of the Act. (R. 18.) However, the ALJ determined at step three (3) that M.B.'s impairments did not medically or functionally equal a Listing impairment. (R. 19.)

With regards to the third step, the ALJ initially determined that M.B.'s impairments did not meet or medically equal any impairment in the Listings. The ALJ noted a list of M.B.'s symptoms, and stated that the echocardiograph demonstrated no acute cardiac impairment outside of her mitral regurgitation, as M.B. presented normal coronary and pulmonary arteries, aorta, valves, and systemic and pulmonary venous return. (R. 19.) The ALJ noted the results of Dr. Virey's exam, which established that M.B. had normal musculoskeletal formation, full range of

motion, and a normal pulse and spine. (R. 19.) The ALJ further concluded that M.B. did not have a learning disorder that meets or medically equals Listing 112.10 for Autistic or Other Pervasive Developmental Disorders, because test results indicated M.B.'s academic functioning was in the low average range, and her cognitive functioning was within the borderline range. (R. 19.) The ALJ noted that M.B.'s third grade report card showed average performance in science and social studies and near average performance in writing, math, and reading. (R. 19.) The ALJ also noted that M.B. was not recommended for special education, and was in general education classes. (R. 19.)

The ALJ further concluded that M.B.'s impairments were not functionally equivalent to any impairment in the Listings. The ALJ concluded that M.B. had less than marked limitations in the domain of "acquiring and using information," because testing had demonstrated that her cognitive functioning was in the borderline range, her academic functioning was in the low average range, and she remained in general education classes. (R. 20.) The ALJ also concluded that M.B. had no significant limitations in the domain of attending and completing tasks. (R. 20.) He further found that M.B. had no limitations in the domains of interacting and relating with others, moving about and manipulating objects, and in caring for oneself. (R. 21-22.) Finally, the ALJ concluded that M.B. had less than marked limitations in the domain of health and physical well-being because, although she had a history of rheumatic fever and joint and chest pain, these conditions were managed with preventative shots of penicillin and over-the-counter medication. (R. 21-22.) The ALJ also noted that while M.B. has two to three ear infections each year, and has been shown to have a mild to moderate speech impediment secondary to mild hearing loss, she maintains "good speech discrimination" and has not been prescribed a hearing aid. (R. 23.)

11

Thus, because M.B. did not suffer from an extreme limitation in any one domain or a marked limitation in any two domains, she was not disabled within the meaning of the Act. (R. 23)

Therefore, because the ALJ concluded that M.B. did not have an impairment or combination of impairments that met, medically equaled or functionally equaled the Listing impairments, he concluded that she was not disabled within the meaning of the Act.

**B.     The ALJ's Decision is Supported by Substantial Evidence**

Plaintiff argues that: (1) the ALJ failed to apply listings for rheumatic heart disease and hearing impairments; (2) the ALJ did not consider all of the evidence in the record and did not address what additional limitations M.B. might suffer because of her "mental illness and obesity"; (3) the ALJ failed to adequately develop the record, and that his failure to subpoena further documents from M.B.'s school amounted to material error, depriving M.B. of a full and fair hearing; and (4) additional reports submitted to the court demonstrate that the outcome should have been different.  For the reasons set forth below, the court finds that the ALJ's decision is supported by substantial evidence.

**1.     Evidence Submitted to the Appeals Council Does Not Alter the ALJ's Decision**

As an initial matter, the court recognizes that it is required to consider all of the evidence in the record, including that which was submitted to the Appeals Council, even if it was not addressed.  *See Perez v. Chater*, 77 F.3d 41, 45-46 (2d Cir.1996) (when the Appeals Council denies review, additional evidence submitted to the Council becomes part of the administrative record and is therefore reviewable by the court).  The court therefore notes that the evidence submitted to the Appeals Council does not alter the conclusion that M.B. is not disabled within the meaning of the Act.  M.B.'s placement in SETSS at most suggests that M.B. may have a

marked limitation in the domain of "acquiring and using information," but is insufficient to suggest a marked limitation in any other domain or a severe limitation in any one domain. Her placement in SETSS is also insufficient to support a finding that she met the criteria of Listing 112.10. The note from Dr. Cohen is duplicative of other evidence in the record, and does not suggest that M.B.'s impairments medically or functionally equaled a Listing impairment.

### 2. There is Substantial Evidence to Support the ALJ's Determination that M.B.'s Impairments Did Not Meet or Medically Equal Listing Impairments

Plaintiff contends that the ALJ failed to apply Listing 104.13 for rheumatic heart disease and Listing 102.08(B)(3) for hearing impairments. (Memorandum of Law in Support of Plaintiff's Cross-Motion for Judgment on the Pleadings ("Doc. 20") at 13, 16-17.) Plaintiff therefore appears to be arguing that M.B.'s impairments meet or medically equal these Listings. Although the ALJ did not address these specific Listings, a court may uphold an ALJ's conclusions despite the absence of an express rationale as long as the court can look to other portions of an ALJ's decision as well as the credible evidence to find the decision supported by substantial evidence. *See Berry v. Schweiker*, 675 F.2d 464, 468 (2d Cir. 1982); *see also Salmini v. Comm'r of Soc. Sec.*, 2010 WL 1170133, at *2 (2d Cir. Mar. 25, 2010). As described below, there is substantial evidence on the record to support the ALJ's implicit findings that M.B. did not have a per se disability under the Listings. *See Salmini*, 2010 WL 1170133, at *2; *Berry*, 675 F.2d at 468; *Dumas v. Comm'r of Soc. Sec.*, 2008 WL 4104685, at *3-4 (E.D.N.Y. Sept. 4, 2008).

#### a. Rheumatoid Arthritis

The court finds that there is substantial evidence to support the ALJ's implicit finding that M.B. did not meet the criteria of Listing 104.13, applicable to rheumatoid arthritis. Listing 104.13 reads:

13

> Rheumatic heart disease, with persistence of rheumatic fever activity manifested by significant murmur(s), cardiac enlargement or ventricular dysfunction (see 104.00C2a), and other associated abnormal laboratory findings; for example, an elevated sedimentation rate or ECG findings, for 6 months or more in a consecutive 12-month period (see 104.00A3e.) Consider under a disability for 18 months from the established onset of impairment, then evaluate any residual impairment(s).

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 104.13.

Although the ALJ did not specifically discuss the requirements of Listing 104.13, he discussed the evidence related to M.B.'s rheumatic fever, and noted that M.B. does not suffer from an acute cardiac impairment outside her mitral regurgitation. (R. 19.) The ALJ also discussed various findings which showed that M.B.'s coronary, pulmonary, and aortic arteries were functioning correctly. The ALJ further discussed the results of her consultative examination with Dr. Virey, which showed that M.B. had normal musculoskeletal development and strength. (R. 19.) Although the medical record shows that M.B. had suffered a 2/6 systolic murmur and mitral regurgitation, an examination by one of M.B.'s treating physicians on September 10, 2004 reflected that M.B.'s symptoms had resolved. (R. 365.) When she was again found to have mitral regurgitation, it was classified as "mild," (R. 360), and not "significant," as required under the Listing. In addition, although M.B. was found on one occasion to have an arrhythmia, (R. 422), as well as elevated ESR and immunoglobin rates on several occasions, (R. 155, 368, 402), these occurred twice in May of 2004, and once in August of 2004, and thus do not satisfy the 6-month durational requirement of Listing 104.13. Furthermore, plaintiff testified at the hearing before the ALJ that M.B.'s heart was "back to regular." (R. 449.) After evaluating the evidence, state agency consultants Drs. Gupta and Kessel concluded that M.B.'s rheumatic fever did not meet, medically equal, or functionally equal the Listing requirements. (R. 166.) Thus, the ALJ's

implicit finding that M.B. did not satisfy the Listing 104.13 criteria for a finding of per se disability based on rheumatic fever is supported by substantial evidence. *See Salmini*, 2010 WL 1170133, at *2 ("Although the ALJ might have been more specific in detailing the reasons for concluding that plaintiff's condition did not satisfy a listed impairment, other portions of the ALJ's detailed decision, along with plaintiff's own testimony, demonstrate that substantial evidence supports this part of the ALJ's determination."); *see also Berry*, 675 F.2d at 468; *Dumas*, 2008 WL 4104685, at *3.

### b. Hearing and Speech Impairments

The court also finds that there is substantial evidence to support the ALJ's implicit finding that M.B. did not meet the criteria of Listing 102.08(B)(3) for a finding of per se disability based on hearing impairments. Plaintiff alleges that the ALJ failed to analyze or cite an array of evidence about M.B.'s hearing and speech problems and repeated ear infections, which plaintiff contends support a finding that these problems were severe enough to meet or equal Listing 102.08(B)(3). (Doc. 20 at 16-17.) Listing 102.08(B)(3) states:

> B. For children 5 years of age and above at time of adjudication:
> . . .
> 3. Inability to hear air conduction thresholds at an average of 40 decibels (db) or greater in the better ear, and a speech and language disorder which significantly affects the clarity and content of the speech and is attributable to the hearing impairment.

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 102.08(B)(3).

Although the ALJ did not outline the specific results of M.B.'s audiological exams, he did note the doctors' observations that M.B.'s hearing loss was "mild," and that she has a "mild" speech impediment. (R. 19.) In addition, the ALJ noted that M.B. did not wear a hearing device, and that testing demonstrated she had "good speech recognition." (R. 19.) M.B. testified that her

hearing had improved since her surgery a month prior to the ALJ hearing. (R. 462.) More importantly, M.B.'s most recent audiological test results show that she could hear air conduction thresholds at an average of 43.7db in her better ear (R. 282), which is above the cusp for a finding of per se disability based on hearing impairment under Listing 102.08(B)(3). Therefore, M.B.'s hearing and speech impediments do not meet or medically equal the Listing criteria. *See Salmini*, 2010 WL 1170133 at *2; *Berry*, 675 F.2d at 468; *Dumas*, 2008 WL 4104685, at *3.

### 3. The ALJ Properly Considered All Evidence in the Record

Plaintiff also contends that the ALJ did not consider all of the evidence in the record and did not address what additional limitations M.B. might suffer because of her "mental illness and obesity." (Doc. 20, at 18-20.) Although the ALJ does not reference M.B.'s psychiatric diagnoses or obesity in his opinion, "[w]hen, as here, the evidence of record permits us to glean the rationale of an ALJ's decision, we do not require that he have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability." *Monguer v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *see also Salmini*, 2010 WL 1170133, at *2; *Gray v. Astrue*, 2009 WL 6364001, at *6 (S.D.N.Y. Dec. 16, 2009) ("An ALJ's decision need not mention every item of testimony presented, nor is an ALJ obligated to mention all of the claimant's impairments in order for his decision to be affirmed.") (internal citations omitted).

Here, the ALJ stated that he considered all of the evidence, (R. 18), which would have included medical evidence related to M.B.'s psychiatric maladies, and showed that M.B. was improving with treatment and had no adverse affects to medication, (R. 339, 341-44). Furthermore, plaintiff never alleged that M.B. suffered additional impairments as a result of her

psychiatric treatment. *See Monguer*, 722 F.2d at 1040 (remand unnecessary where the ALJ stated that the considered all of the relevant evidence presented, and there was evidence on the record that plaintiff never alleged the relevant impairment);

In addition, with regard to the potentially limiting effects of M.B.'s obesity, the ALJ explicitly referenced the report of consultative pediatrician Dr. Virey, who concluded that M.B. has full range of motion, adequate muscle strength, and no acute cardiac impairment. (R. 19.) Furthermore, the record contains no reference to M.B.'s obesity, or complications arising from it. Indeed, M.B. and her mother reported that M.B. likes to jump rope and play with friends. (R. 161, 163-64.) Therefore, because the evidence of the record permits the court to glean the ALJ's rationale behind a finding that M.B. was not disabled, and because it appears that the ALJ considered the entire record presented him, remand is not necessary despite the ALJ's failure to explicitly discuss these medical conditions. *See Monguer*, 722 F.2d at 1040; *Berry*, 675 F.2d at 469; *Dumas*, 2008 WL 4104685, at *3.

### 4. The ALJ's Proper Development of the Record

Plaintiff's final allegation is that the ALJ failed to adequately develop the record, and that his failure to subpoena further documents from M.B.'s school amounted to material error, depriving M.B. of a full and fair hearing. (Doc. 20, at 8, 16, 20, 21.) The ALJ is under an obligation to develop the complete medical history for at least a twelve-month period prior to the date of the application for benefits. *See* 42 U.S.C. § 423(d)(5)(B); 20 C.F.R. § 416.912(d)(2). "Whether additional . . . evidence is necessary to adequately develop the record beyond that statutorily mandated by the Act is under the discretion of the ALJ." *Infante v. Apfel*, 2001 WL

536930, at *7 (S.D.N.Y. May 21, 2001). It is also important to note that the regulations place the burden of supplying relevant evidence on the claimant. *See* 20 C.F.R. §404.1512.

Here, the ALJ certainly fulfilled his duty. The extensive record in this case contains a complete medical history for M.B. during the pertinent timeline, and beyond. Indeed, the ALJ took great measures to develop the record, which includes evidence spanning from 1994 to 2006—far beyond the twelve-month period the ALJ was obligated to investigate. As plaintiff acknowledges, the ALJ used his subpoena powers to obtain evidence from doctors and hospitals where M.B. had received treatment (Doc. 20, at 20), including records from BMC, Elmhurst Hospital, Brookdale Hospital, Kings County Hospital, and Mary Immaculate Hospital (R. 66-67; 124; 138-54, 159-60, 183-236, 249, 270, 352-406; 240-46, 267, 272; 258-64.) In addition, the ALJ obtained records from M.B.'s schools, including her third grade report card from 2003-2004 (R.109-10), the disability evaluation by M.B.'s third grade teacher (R. 85-92), and M.B.'s evaluation by the Committee on Special Education (R. 129-32.) Where the record contains evidence "from the entire relevant period, and beyond," and contains numerous reports and results of medical exams, "[i]t is simply not the case that the ALJ reached his conclusion on an incomplete record." *Friedman v. Astrue*, 2008 WL 3861211, at *8 (S.D.N.Y. Aug. 19, 2008). (ALJ based decision on record containing medical documentation spanning eight years).

Plaintiff nevertheless argues that the ALJ failed to gather all of the relevant evidence. As evidence of the ALJ's error, plaintiff submits two reports—one from school psychologist Dr. Ira Rubenstein, and one from speech/language pathologist Claire Gordon. (Doc. 19, Exs. A, B; Doc. 20, at 20.) However, plaintiff fails to explain how this evidence would have affected the outcome of the proceedings. Plaintiff's reference to these documents, and her conclusory statement that

18

this evidence reveals the ALJ's material error in not subpoenaing further records, is insufficient to show that the ALJ did not fulfill his duty to develop the record. *Velasquez v. Barnhart*, 2006 WL 3431190, at *4 (S.D.N.Y. Nov. 29, 2006) (rejecting petitioner's argument about development of the record where she failed to describe what relevance she believed the supplemental records would have to the disability determination). Therefore, plaintiff's allegation that M.B. was deprived of a full and fair hearing due to the ALJ's failure to develop the record is without merit.

### 5. New Evidence Does Not Alter the ALJ's Decision

Although plaintiff contends that the reports of Dr. Rubenstein and Ms. Gordon were not intended to be submitted as evidence in this proceeding, (Doc. 20, at 20), clearly plaintiff sought to use these documents as evidence of the ALJ's failure to develop the record, and, implicitly, as evidence that M.B.'s conditions were more severe than the record reflected. As such, the court will evaluate this new evidence under the three-part test established by the Second Circuit.

A claimant must show that (1) the proffered evidence is "'new' and not merely cumulative of what is already on the record," (2) that the evidence is "material, that is, both relevant to the claimant's condition during the time period for which benefits were denied and probative," and (3) that there is good cause for the failure to present the evidence earlier. *Jones v. Sullivan*, 949 F.2d 57, 60 (2d Cir. 1991) (internal citations omitted); *Smith-Siegel v. Astrue*, 2010 WL 2834888, at *1 n.2 (S.D.N.Y. June 23, 2010). "Materiality" requires a reasonable possibility that the new evidence would have influenced the Commissioner's decision to decide claimant's application differently. *Id.*; *Pollard*, 377 F.3d at 193 (citing *Tirado v. Bowen*, 842 F.2d 595, 597 (2d Cir. 1988)). A court may remand a case to the Commissioner for consideration of new evidence if it determines that all three requirements are met. *Id.*; *Jones,* 949 F.2d at 60.

Here, the reports of Dr. Rubenstein and Ms. Gordon do not warrant remand to the Commissioner because the plaintiff has not shown any cause—let alone good cause—for her failure to introduce these documents in the original record. Dr. Rubenstein's assessment of M.B. was generated on December 15, 2006, (Doc. 19, Ex. B, at 1), over a month before the ALJ issued his decision. Plaintiff could have submitted this document to the ALJ for consideration and entry into the record prior to the issuance of his decision. In addition, plaintiff could have submitted Dr. Rubenstein's report to the Appeals Council, along with the other two documents she submitted. (R. 439-42.) Ms. Gordon issued her report on January 04, 2008, (Doc. 19, Ex. A, at 1), five days prior to the Appeals Council's request for additional information from plaintiff. (R. 8.) As already discussed, plaintiff submitted additional evidence to the Appeals Council, and offers no explanation for why these two reports were not included with the submission of the other new evidence. Therefore, in the absence of any showing of good cause for failure to incorporate this evidence into the original record, this new evidence does not warrant remand.

## CONCLUSION

For the reasons set forth above, the Commissioner's motion for judgment on the pleadings is granted, and plaintiff's cross-motion for judgment on the pleadings is denied. The Commissioner's decision is affirmed.

SO ORDERED.

Dated: Brooklyn, New York
September 29, 2010

/s/
DORA L. IRIZARRY
United States District Judge

20